**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LISA TERRELL and** | : | **CIVIL ACTION NO. 1:06-CV-1004** |
| **NAIDEA GARWOOD,** | : | |
| | : | **(Judge Conner)** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF HARRISBURG POLICE** | : | |
| **DEPARTMENT, CHARLES KELLAR,** | : | |
| **RICHARD PICKLES, and TODD** | : | |
| **GILCHRIST,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

This is an employment discrimination action in which plaintiffs Lisa Terrell ("Terrell") and Naidea Garwood ("Garwood"), both of whom are African American, contend that defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17; 42 U.S.C. § 1983; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. §§ 951-964. Plaintiffs were formerly employed in the 911 emergency call center of defendant City of Harrisburg Police Department (hereinafter "the police department" or "department"), and they allege that the department discriminatorily discharged them for their handling of two emergency calls. Defendants have filed a motion for summary judgment on the basis that plaintiffs have proffered insufficient evidence to support their claims. For the reasons that follow, the motion will be granted.

## I.   __Statement of Facts__[1]

Prior to their discharge, Garwood and Terrell worked as telecommunicators in the police department's 911 emergency call center.  Telecommunicators' primary duties include answering emergency calls and inputting information received from callers into the department's computer aided dispatch system (hereinafter "CAD system").  (Doc. 27, Exs. D-1, D-2.)  The CAD system then transfers the information to police dispatchers, who direct officers to respond to emergency requests.  (Doc. 27, Ex. D-8 § II.3.)

### A.   __The Emergency Calls__

This case arises from Garwood and Terrell's handling of emergency calls placed by Kathy Hall ("Hall") on June 4, 2005.[2]  That afternoon, Hall went shopping

---

[1]In accordance with the standard of review for a motion for summary judgment, the court will present the contested facts in the light most favorable to plaintiffs, as the non-moving parties.  See infra Part II.

[2]Defendants have filed a statement of material facts containing 414 paragraphs.  Plaintiffs have neither admitted nor denied the averments in 117 of these paragraphs, ostensibly because they either lack knowledge regarding the truth thereof or because defendants' contentions raise issues of witness credibility to be adjudicated at trial.  (See Doc. 36 ¶¶ 1, 4-8, 10, 17-24, 26-27, 30-31, 33-34, 36-40, 42-45, 49, 52, 241-45,  247-49, 252-53, 257, 269-70, 272-73, 277-84, 286, 288-92, 300-06, 308, 310, 312-17, 323-35, 360, 369, 372, 380-93, 400-01, 403-11.)  It is elementary that a motion for summary judgment imposes a burden on "the non-moving party [to] produce admissible evidence containing 'specific facts showing that there is a genuine issue for trial.'"  Vitalo v. Cabot Corp., 399 F.3d 536, 542 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(e)).  A non-movant who lacks contrary evidence may file an affidavit describing the reasons for its inability to respond.  See FED. R. CIV. P. 56(f).  A non-movant may rely on his or her lack of evidence only if the movant's proffer alleges the state of mind of a witness.  See Norfolk S. Ry. Co. v. Basell USA, Inc., 512 F.3d 86, 96 (3d Cir. 2008).  Race discrimination cases frequently require an inquiry into the defendant's state of mind to determine whether the defendant's

with Patricia Webster ("Webster"), her aunt and friend.  (Doc. 25 ¶ 4; Doc. 36 ¶ 4.)

Hall arranged for her niece, fifteen-year-old K.B.,[3] to babysit her three-year-old

daughter, G.H., during her absence.  (Doc. 25  ¶ 4; Doc. 36 ¶ 4.)  She left G.H. with

K.B. at 1:00 p.m. and telephoned K.B. several times throughout the afternoon.

---

actions were motivated by the plaintiff's race or national origin.  Nevertheless, "Faced with a properly supported summary judgment motion, however, a plaintiff [alleging discrimination] must come forth with some evidence sufficient to create a genuine issue of material fact."  Ramos v. EquiServe, 146 F. App'x 565, 568-69 (3d Cir. 2005.)

In the instant case, plaintiffs have refused to respond, *inter alia*, to the following averments in defendants' Local Rule 56.1 statement of material fact:

- Plaintiffs asked Kathy Hall whether she planned to press charges against her babysitter, (Doc. 25 ¶ 10; Doc. 36 ¶ 10);
- Hall did not mention the existence of a note from the babysitter during her conversation with Garwood, (Doc. 25 ¶ 17; Doc. 36 ¶ 17);
- Personnel policies produced by defendants explain the workplace expectations for individuals employed by the police department, (Doc. 25 ¶¶ 49, 52; Doc. 36 ¶¶ 49, 52);
- Defendant Todd Gilcrist drafted a summary of the incident prior to plaintiffs' pre-termination hearings that recommended potential discipline for plaintiffs' handling of Hall's emergency calls.  (Doc. 25 ¶ 257; Doc. 36 ¶ 257.)

Clearly, such assertions present issues of objective fact that require a response from plaintiffs and cannot be denied simply because plaintiffs' discovery attempts have produced no contrary evidence.  Plaintiffs' counsel has not filed a Rule 56(f) affidavit explaining the deficiency of plaintiffs' evidentiary proffer.  Accordingly, the court will deem admitted all objective factual averments in defendants' statement of material facts to which plaintiffs have not responded.  See L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."); see also Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 130 (3d Cir. 1998) ("It is by now axiomatic that a nonmoving party . . . cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit. . . .").  Allegations pertaining to a witness's state of mind will remain controverted, as they are beyond plaintiffs' ability to obtain contrary evidence.

[3]Whether K.B. and Webster are related is unclear from the present record.

(Doc. 27, Ex. A ¶ 5.)  Hall returned at approximately 6:45 p.m. but was unable to

locate either G.H. or K.B.  (Doc. 25  ¶ 5; Doc. 36 ¶ 5.)  Hall and Webster searched

K.B.'s home but found it empty.  (Doc. 25 ¶ 7; Doc. 36 ¶ 7.)  Hall and Webster also

checked the immediate neighborhood and contacted several nearby relatives to no

avail.  (Doc. 27, Ex. A at 8.)

As the search continued, Hall's concern grew to panic, and she asked

Webster to call the police.  (Id. ¶¶ 9-10.)  Webster placed a 911 emergency call, which

Garwood answered.  (Id. ¶ 10; Doc. 27, Ex. D-35 at 3.)  An audio recording of the call

reflects that Garwood spoke with both Hall and Webster, who explained that K.B.

often babysat G.H. and that both girls were missing.  (Doc. 27, Ex. B at 108; Doc. 27,

Ex. D-35 at 3.)  Garwood then asked Webster:  "Why does [Hall] think that [K.B.]

abducted the child?"  (Doc. 27, Ex. D-35 at 3.)  Neither Hall nor Webster had

mentioned abduction prior to Garwood's question.  Webster responded that Hall

did not think K.B. had abducted G.H. and simply wanted to locate the children.

(Id.; Doc. 27, Ex. B at 133-34.)  Garwood asked to speak to Hall, and the following

exchange ensued:

| | |
|---|---|
| Garwood: | Ma'am. . . . Are you going to file charges against the sitter? |
| Hall: | I can't hear you. |
| Garwood: | Will you be filing any sort of charges against the babysitter? |
| Hall: | No. [Crying.] I just want them found. |
| Garwood: | Okay. How are we supposed to find them if you don't know where they are? |
| Hall: | It's not my [expletive] job. I don't know. [Crying.] |
| Garwood: | Okay. If it's not your job, ma'am, then how are we going to find someone where we have no idea where they are? [Hall crying.] I understand that you are upset, but you don't know where this |

> woman is, ma'am.  We aren't going to know either.  [Hall continues crying.]
>
> How familiar are you with your babysitter?  [Hall continues crying.]  Ma'am?  Ma'am, how familiar are you with the babysitter?  Can you put the other lady back on the phone please?  [Call terminates.]

(Doc. 27, Ex. D-35 at 4-5.)  Garwood recalled that Hall was "crying hysterically" throughout the call.  (Doc. 27, Ex. B at 114, 158.)  Garwood did not input Hall's request for assistance into the CAD system, and no police officer was dispatched to assist Hall after her conversation with Garwood.  (Doc. 27, Ex. H ¶ 7; Doc. 27, Ex. I ¶ 5.)

Hall again telephoned the emergency call center twenty-five minutes later and spoke with telecommunicator trainee Amy Clementz ("Clementz").  (Doc. 27, Ex. C at 16; Doc. 27, Ex. D-35 at 6.)  Clementz placed Hall on hold while she answered another incoming call, and Terrell picked up Hall's line.  Hall explained that K.B. and G.H. were still missing but that she had discovered a note from K.B., which stated that K.B. had taken G.H. for a walk.  (Doc. 27, Ex. D-35, at 6.)  Terrell responded:

> Terrell:   Okay, ma'am.  If you left your child with someone that evidently you felt as though they were responsible enough to watch your child—okay, if they went for a walk and they said that they would be back, then they'll be back.  How are we supposed to do anything if we don't—if you don't know where they are and we don't know where they are?
>
> Hall:   They said they went for a walk and they [inaudible.]  Don't you think you should [expletive] do something?
>
> Terrell:   Okay.  First of all you don't have to use that language with me. You made the choice to leave your child out there.  I don't understand what you want the police to do at this point.  We come over, we take a report, and then do what?  Maybe they

5

were around the corner.  Do you know any of her [(K.B.'s)] friends or anything?

(Id. at 7.)  Terrell then obtained Hall's contact information and entered it into the CAD system, and an officer was dispatched to assist Hall.[4]  (Doc. 27, Ex. D at 216-17; Doc. 27, Ex. D-35 at 8-9.)  Prior to the officer's arrival, K.B. and G.H. were found with K.B.'s boyfriend, who had taken them for a ride in his car.  (Doc. 27, Ex. A ¶ 21; Doc. 27, Ex. D-62 at 1.)

Both Garwood and Terrell admitted that the recording of their conversations with Hall is accurate, though both recall making additional statements that are not reflected on it.  (Doc. 27, Ex. B at 120-21; Doc. 27, Ex. D at 204-12.)  Garwood stated that Hall described the note left by K.B. during the first emergency call.  (Doc. 27, Ex. B at 123-24.)  She also testified that she requested contact information from Hall and suggested that K.B. and G.H. may have gone to a nearby neighborhood festival. (Id. at 123-24, 135.)  Neither statement appears in the recording.  (Id.)  Terrell testified that during the second emergency call, Hall harangued her, shouting: "You people make me sick, just get on my [expletive] nerves.  I should—I want to get the [expletive] out of this city."  (Doc. 27, Ex. D at 209.)  These statements are also absent from the transcript.

---

[4]Helen Solivan, Terrell's supervisor, testified that Terrell did not input the call into the CAD system until Solivan instructed her to do so.  (Doc. 27, Ex. E at 15, 35.)  Terrell contradicted Solivan's assertion, stating that she entered Hall's information without Solivan's prompting.  (Doc. 27, Ex. D at 216-17.)

### B.    The Department's Procedures for Documenting Emergency Calls

The police department requires telecommunicators to obtain specific information from callers depending upon the type of emergency reported.  The department provides telecommunicators with checklists that enumerate precise information to be gathered for various incidents.  (See Doc. 27, Ex. D at 50-53; Doc. 27, Ex. D-7.)  The checklist for a call involving a missing child instructs telecommunicators to inquire about the location from which the child is missing, the child's last known whereabouts, and what may have caused the disappearance. (Doc. 27, Ex. D at 50-53; Doc. 27, Ex. H at 3; Doc. 27, Ex. D-7.)  They must also request the caller's contact information and a physical description of the child (Doc. 25 ¶¶ 140-41; Doc. 27, Ex. H at 3; Doc. 27, Ex. D-7; Doc. 36 ¶¶ 140-41.) Telecommunicators then input the information into the CAD system, after which officers are dispatched to the scene of the incident.  (Doc. 27, Ex. D-8 § XI.1.K.)  All calls reporting missing children are to be entered in the CAD system regardless of whether the telecommunicator receiving the call doubts the caller's veracity.  (Doc. 27, Ex. C at 3; Doc. 27, Ex. D-8 § II.3.)

According to Todd Gilcrist ("Gilcrist"),[5]  who supervises the police department's communications center, plaintiffs' conversations do not comply the department's procedures for handling emergency calls.  (Doc. 27, Ex. H ¶¶ 6-8.)

---

[5]Defendant Todd Gilcrist appears to be incorrectly named in plaintiffs' complaint as Todd Gilc*h*rist.  Defendant's filings indicate that the former spelling is correct.

Gilcrist testified that Garwood and Terrell asked Hall several inappropriate questions, including what type of assistance Hall expected to receive from police, whether she planned to file charges, and whether she knew K.B. well.  (Id.)  He also stated that plaintiffs violated emergency response procedures by failing to request a description of the missing children and by neglecting to ask where they were last seen.  (Id.)

### C.    Hall's Complaint and Plaintiffs' Discharge

The day after the incident, Hall filed a grievance alleging that Garwood and Terrell's abrasive inquiries during the two emergency calls were inappropriate and prevented her from receiving timely police assistance.  (Doc. 25   ¶ 41; Doc. 27, Ex. A ¶¶ 22-23; Doc. 27, Ex. D-62; Doc. 36 ¶ 41.)  Gilcrist reviewed Hall's complaint and the recording of the telephone conversations.  (Doc. 27, Ex. H ¶¶ 1, 4-8.)  He was concerned that Garwood and Terrell's handling of the calls did not comply with emergency response procedures, and he relayed his assessment to defendant Richard Pickles ("Pickles"), who is commander of the police department's technical services division.  (Id. ¶ 9; Doc. 27, Ex. I ¶ 3.)  Gilcrist and Pickles conferred with a representative from the office of the mayor and recommended to defendant Chief of Police Charles Kellar ("Kellar") that a disciplinary hearing be held to evaluate plaintiffs' conduct further.  (Doc. 27, Ex. H ¶¶ 23-25; Doc. 27, Ex. I ¶¶ 13-14.)  Kellar approved the recommendation, and hearings were conducted on June 10, 2005. (Doc. 27, Ex. H ¶ 25, Doc. 27, Ex. D-55.)

8

Before the hearing, Gilcrist submitted disciplinary recommendations to Kellar and the mayor's office.  He recommended that Garwood's employment be terminated and that Terrell be given a ten-day suspension, thirty days without overtime, and one day of retraining conditioned on her acceptance of responsibility for her alleged mistakes.  (Doc. 27, Ex. H ¶ 32; Doc. 27, Ex. D-64 at 2-3.)  He also recommended that she be required to remain infraction-free for a period of between six and twelve months.  (Doc. 27, Ex. D-64 at 3.)

Gilcrist, Pickles, Kellar, and other city employees attended Garwood and Terrell's disciplinary hearings.  (Doc. 27, Ex. H ¶ 33; Doc. 27. Ex. I ¶ 18; Doc. 27, Ex. J ¶ 8.)  At her hearing, Terrell denied that her comments during the emergency call were abrasive but acknowledged that some in Hall's situation might have found them discourteous.  (Doc. 27, Ex. D at 262.)  She offered to write a letter of apology to Hall to resolve the situation.  (Id.)  Gilcrist, Pickles, and Kellar unanimously testified that they perceived Terrell's behavior during the hearing as a refusal to accept responsibility for her alleged improper handling of Hall's emergency call. (Doc. 27, Ex. H ¶ 44; Doc. 27, Ex. I ¶ 29; Doc. 27, Ex. J ¶ 2.)  Garwood acknowledged that she did not handle the call in accordance with department policy or her training.  (Doc. 27, Ex. D-35 at 3-5; Doc. 27, Ex. B at 161.)  Gilcrist and Pickles recalled that Garwood offered no explanation for her actions, though she viewed termination as a harsh sanction.  (Doc. 27, Ex. H ¶ 36.)  After the hearings, Gilcrist prepared a written briefing of Garwood and Terrell's employment performance, disciplinary history, and conduct when responding to Hall's emergency requests.

(Id. ¶ 41; Doc. 27, Ex. D-65.)  Pickles reviewed and adopted the briefing, which he

and Gilcrist jointly submitted to Kellar.  (Doc. 27,  Ex. H ¶ 41; Doc. 27, Ex. I ¶ 28;

Doc. 27, Ex. D-65.)

Kellar, as chief of police, had exclusive authority to determine whether to

terminate plaintiffs' employment.  (Doc. 27, Ex. H ¶ 44; Doc. 27, Ex. I ¶ 29; Doc. 27,

Ex. J ¶ 2.)  He reviewed the briefing submitted by Gilcrist and Pickles as well as

internal department documentation relating to Hall's emergency calls.  (Doc. 27,

Ex. J ¶ 16.)  He concluded that Garwood and Terrell should be discharged for their

misconduct.  (Id. ¶ 20.)  He terminated Garwood because she exhibited abrasive

telephone demeanor, failed to obtain required information from Hall, neglected to

input call data into the CAD system, and exposed the City of Harrisburg to potential

civil liability had injury befallen G.H. or K.B.[6]  (Id. ¶ 17.)  Kellar terminated Terrell's

employment for her allegedly inflammatory telephone comments, which

exacerbated Hall's distress.  (Id. ¶ 20.)  He also discharged her because she failed to

follow department protocol for requesting information from callers and entering it

into the CAD system, and she neglected to accept responsibility for her mistakes

---

[6]The court expresses no opinion regarding the fidelity of Kellar's legal
conclusion that Garwood's failure to dispatch an officer to assist Hall could have
exposed the city to civil liability.  See 42 PA. CONS. STAT. § 8542 (enumerating
exceptions to governmental immunity); Regester v. County of Chester, 797 A.2d 898,
900-05 (Pa. 2002) (analyzing wrongful death and survival claims associated with the
emergency response provided by municipal subagencies under § 8542).

during her disciplinary hearing.[7]   (Id.)  Gilcrist and Pickles later delivered

termination letters to plaintiffs.  (Doc. 27, Ex. H ¶ 43; Doc. 27, Ex. I ¶ 31.)

Garwood and Terrell commenced the instant action on May 17, 2006, alleging

Title VII and PHRA disparate treatment claims against the police department on

the grounds that it disproportionately disciplined them based on their race.  They

also advance claims under § 1983 against all defendants for violation of their equal

protection rights.  Defendants move for summary judgment, asserting that

plaintiffs' have failed to produce adequate evidence to support their claims.  The

parties have fully briefed these issues, which are now ripe for disposition.

## II.   <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact," and for which a jury trial

would be an empty and unnecessary formality.  <u>See</u> Fed. R. Civ. P. 56(c).  It places

the burden on the non-moving party to come forth with "affirmative evidence,

beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v.
City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e); <u>see
also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be

---

[7]Kellar testified that he discharged Terrell in part because she failed to
accept responsibility for her improper handling of Hall's emergency request.  (Doc.
27, Ex. J ¶ 20.)  Terrell contradicted this testimony, stating that she understood why
Hall may have been offended by her comments and that she offered to apologize for
them.  (Doc. 27, Ex. D at 262.)  In accordance with the standard of review on a
motion for summary judgment, <u>see</u> <u>infra</u> Part II, the court infers from Terrell's
testimony that she accepted responsibility for her actions.

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.   **Discussion**

Garwood and Terrell advance disparate treatment claims against the police department under Title VII and the PHRA .  They also bring a § 1983 claim against all defendants.  The court will address these issues *seriatim*.

### A.   **Disparate Treatment Claims**

Garwood and Terrell allege that they suffered disparate treatment on the basis of race in response to their handling of Hall's emergency call.[8]  To withstand a

---

[8]Race discrimination is proscribed by Title VII, which provides, in pertinent part, as follows:

It shall be an unlawful employment practice for an employer—

(1)  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2)  to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

motion for summary judgment on a disparate treatment claim, a plaintiff must

establish that his or her membership in a protected class "played a role in the

employer's decision-making process and had a determinative influence on the

outcome of that process." Monaco v. Amer. Gen. Assurance. Co., 359 F.3d 296, 300

(3d Cir. 2004). A plaintiff may meet this burden with either direct evidence, see

Price Waterhouse v. Hopkins, 490 U.S. 288 (1989) (O'Connor, J., concurring), or

circumstantial evidence, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

(1973). In the instant case, Garwood and Terrell have not provided direct evidence

of discrimination;[9] therefore, the court will examine their claims using the three

step burden-shifting analysis set forth in McDonnell Douglas.

Under McDonnell Douglas, a plaintiff must first establish a prima facie case

of discrimination by proving the following elements: (1) the plaintiff is a member of

a protected class, (2) the plaintiff was qualified for the position the plaintiff held or

sought, (3) the plaintiff suffered an adverse employment action, and (4) the

circumstances of the adverse employment action give rise to an inference of

discrimination. Johnson v. Keebler-Sunshine Biscuits, Inc., No. 06-3219, 2007 WL

---

[9]Direct evidence is "evidence that proves an ultimate fact in the case without any process of inference." Woodson v. Scott Paper Co., 109 F.3d 913, 930 (3d. Cir. 1997). An employer who discriminates "will almost never announce a discriminatory animus or provide employees or courts with direct evidence of discriminatory intent." Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999). A plaintiff who wishes to establish a prima facie case of discrimination using direct evidence "faces a high hurdle." Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998). The court has found no evidence of record to suggest that Garwood and Terrell have cleared this hurdle in the instant action.

215801, at *2 (3d Cir. 2007); <u>Connors v. Chrysler Fin. Corp.</u>, 160 F.3d 971, 974 (3d Cir. 1998).  A plaintiff may establish the final element of the prima facie case by proffering evidence that "similarly situated employees outside the protected class received more favorable treatment."  <u>Horton v. Nicholson</u>, 435 F. Supp. 2d 429, 434 (E.D. Pa. 2006).  Once the prima facie case is established, the burden shifts to the defendant to articulate some "legitimate, nondiscriminatory reason" for the plaintiff's treatment.  <u>Iadimarco v. Runyon</u>, 190 F.3d 151, 157 (3d Cir. 1999) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802); <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997).  The defendant's burden to prove a legitimate non-discriminatory reason is "relatively light."  <u>Johnson</u>, 2007 WL 215801, at *3.  The defendant is only required to prove that its actions could have been motivated by the proffered legitimate, nondiscriminatory reason; proof of actual causation is not required.  <u>Iadimarco</u>, 190 F.3d at 157.  Once the defendant has met its burden, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination."  <u>Johnson</u>, 2007 WL 215801, at *2.  The plaintiff may meet this burden by presenting evidence from which a reasonable factfinder could "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  <u>Keller</u>, 130 F.3d at 1108.

Turning to the prima facie case, defendants do not dispute that Garwood and Terrell are members of a protected class based upon their race, (<u>see</u> Doc. 1 ¶¶ 3-4;

14

Doc. 7 ¶¶ 3-4), that they suffered an adverse employment action in the form of termination, (see Doc. 27, Ex. J ¶¶ 16, 18), or that they were qualified for their positions as emergency telecommunicators and dispatchers, (see Doc. 27, Ex. D-65 at 7).  The lone disputed element of plaintiffs' prima facie case is whether the circumstances of their discharge create an inference of discrimination.  Garwood and Terrell contend that they were disciplined more severely than certain individuals outside of their protective class.  Defendants respond that none of these individuals were similarly situated with plaintiffs.  Alternatively, Garwood and Terrell argue that the circumstances of their discharge raise an inference of discrimination regardless of whether any of their coworkers were, in fact, treated more favorably.

### 1.    Individuals Similarly Situated with Plaintiffs

Garwood and Terrell first argue that their discharge creates an inference of discrimination because they were treated differently than their similarly situated coworkers.  "[W]hether an individual can satisfy the 'similarly situated' requirement triggers a fact-intensive inquiry based on a whole constellation of factors facing that individual employee." Monaco, 359 F.3d at 306.  Similarly situated employees are those who "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002); see also Red v. Potter, No. 05-5256, 2006 WL

3349563, at *2 (3d Cir. 2006) (stating that "in order to show that an employee is 'similarly situated,' all of the relevant aspects of employment need to be nearly identical").  "In determining whether similarly situated nonmembers of a protected class where treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action."  Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998).

In the instant matter, Kellar, who made the decision to discharge plaintiffs, stated that he terminated them because of the callous, abrasive comments and their failure to request information about G.H. and K.B., as required by police department protocol.  (Doc. 27, Ex. J ¶¶ 17, 20.)  Kellar discharged Terrell for her egregious misconduct in handling the emergency situation, including her failure to glean appropriate information from Hall.  (Id. ¶ 20.)  Garwood's termination was also motivated by her failure to enter the emergency call into the CAD system.  (Id. ¶ 17.)

Bearing these factors in mind, the court will evaluate those individuals with whom plaintiffs claim they were similarly situated to determine whether plaintiffs have raised an inference of discrimination.  Plaintiffs have identified four individuals outside of their protected class whom they allege defendants treated differently:  William Junkin, Kristin Baker, Ruth Carrasquillo, and Deb Baker.[10]

---

[10]The record does not indicate whether Kristin Baker and Deb Baker are related.

(<u>See</u> Doc. 27, Ex. D at 89-91; Doc. 27, Ex. D-12 ¶ 16.)  All of these individuals were employed as telecommunicators for the department during the same period as plaintiffs.  (<u>See</u> Doc. 27, Exs. D-13, D-14, D-15, D-16.)

William Junkin ("Junkin"), who is Caucasian, was disciplined on January 23, 2003 after he neglected to dispatch medical assistance in response to a call from an individual contemplating suicide.  (Doc. 27, Ex. D-13.)  The individual reported consuming excessive amounts of alcohol in combination with antidepressant medication.  (<u>Id.</u>)  Junkin appropriately dispatched police; however, department policies also required an immediate response by medical personnel.  (<u>Id.</u>)  Junkin received a five-day suspension for his actions.  (<u>Id.</u>)  The discipline did not involve Junkin's telephone etiquette, a failure to request necessary information from the caller, or a failure to dispatch police.  Garwood and Terrell's actions implicated such concerns.  Hence, Junkin is not similarly situated with plaintiffs.

Kristin Baker, a  Caucasian employee, received discipline on August 4, 2005, after she neglected to inform her supervisors that she had taken prescription medication that could adversely affect her work performance.  She also used the police department's computer network without authorization to distribute her personal health information to other coworkers.  (Doc. 27, Ex. H ¶ 53; Doc. 27, Ex. D-15.)  Both actions violated the department's employment policies.  (Doc. 27, Ex. D-15.)  Gilcrist testified that she accepted responsibility for her actions at a disciplinary hearing, and she received a five-day suspension as a result.  (<u>Id.</u>; Doc. 27, Ex. H ¶ 53.)  Unlike Garwood and Terrell, her infractions were wholly unrelated

17

to her handling of emergency calls, and she is therefore not similarly situated with plaintiffs.

Ruth Carrasquillo ("Carrasquillo"), who is Hispanic, was disciplined on three occasions between March 2005 and April 2006. In late-March 2005, she was instructed to enter a stolen vehicle license plate number into a national database that tracks criminal activity. (Doc. 27, Ex. D-31.) She transposed characters in the number, which resulted in an officer in another municipality executing an erroneous felony traffic stop. (Id.) Gilcrist testified that Carrasquillo accepted responsibility for the mistake, and the three-day suspension she originally received was reduced to two days. (Id.; Doc. 27, Ex. H ¶ 55; Doc. 27, Ex. D-14.) Her next discipline occurred in March 2006, when an emergency caller reported the presence of suspicious individuals, one of whom was carrying a firearm. (Doc. 27, Ex. D-17.) She entered an incorrect street name into the CAD system, causing police to respond to the wrong location. (Doc. 27, Ex. H ¶ 57.) Gilcrist testified that she accepted responsibility for the mistake and received a five-day suspension, due in part to the potentially dangerous involvement of armed individuals. (Id.; Doc. 27, Ex. D-17.) Carrasquillo was last disciplined for an emotional outburst on April 19, 2006. While working the night shift, she screamed in the presence of her coworkers that she "hate[d] this [expletive] place" and that her "kids [were] sick and this isn't fair." (Doc. 27, Ex. D-66 at 43.) She received a five-day suspension as a result.

Carrasquillo is not similarly situated with plaintiffs. None of her disciplinary actions resulted from her demeanor when interacting with emergency callers or

from comments made to them.  The data entry errors that form the basis of her first two disciplinary actions were purely ministerial in nature.  Unlike plaintiff Garwood, Carrasquillo placed information into the CAD system when department protocol dictated that she do so, and she dispatched police when appropriate.  Unlike both plaintiffs, she did not make inflammatory comments that exasperated a distressed emergency caller.  Garwood and Terrell cannot rely on Carrasquillo's discipline to establish the inference of discrimination necessary to their prima facie case.

Plaintiffs lastly allege that Deb Baker ("Baker"), a Caucasian coworker, was similarly situated with them but received more favorable treatment.  Baker was disciplined in October 2005 after incorrectly entering the address of a fire alarm into the CAD system.  (Doc. 27, Ex. D-66 at 16.)  She received a three-day suspension for the mistake.  (Id.)  A second disciplinary action followed in February 2006, when Baker failed to input a call from the Dauphin County Communications Center into the CAD system.  (Id.; Doc. 27, Ex. H at ¶ 54.)  The call requested that a police officer be dispatched to search for a fire along the entire length of 17th Street.  (Doc. 27, Ex. D-16.)  Gilcrist characterized the call as "highly unusual" because the County Communications Center rarely requests assistance from the Harrisburg police department.  (Doc. 27, Ex. H ¶ 54.)  At a disciplinary hearing, Baker stated that the call confused her because the CAD system, which requires entry of a specific address or block number, is not programmed to process calls for assistance along the entire length of a street.  (Doc. 27, Ex. H ¶ 54.)  Gilcrist testified

19

that Baker accepted responsibility for her actions and acknowledged that she should have sought guidance from a supervisor about how to handle the call.  (Id.)  She received a twelve-day suspension for the incident.  (Id.; Doc. 27, Ex. D-16.)

Unlike plaintiffs, Baker did not interact abrasively with emergency callers, and she never exhibited inappropriate telephone etiquette during her conversations with them.  Although she neglected to enter a call into the CAD system, she was faced with a unusual request from another local government entity, and she acknowledged that she should have sought guidance from a supervisor.  Garwood, in contrast, failed to enter data into the CAD system when presented with a routine emergency call.  Baker is not similarly situated with plaintiffs, and Garwood and Terrell have therefore identified no individual outside of their protected class whom defendants treated more favorably.

     **2.**    **Inference of Discrimination from the Circumstances of Plaintiffs' Discharge**

Plaintiffs next assert that the incomplete recordings of their conversations with Hall raise an inference of discrimination notwithstanding the dearth of evidence that plaintiffs were treated more severely than their coworkers.  They contend that interstices in the recording demonstrate that defendants have "alter[ed] or 'doctor[ed]' the [telephone call] records to suit their needs,"[11] thereby

_____

[11]The recording, which defendants submitted as Exhibit D-61 to Document 27, consists of thirty-five compact disc tracks, most of which are fewer than fifteen seconds in length.  Electronic beeping occurs at intervals throughout the tracks, portions of which often overlap from one to the next.  Many tracks begin or end with several seconds of silence before the next segment of conversation is heard.

raising an inference of discrimination. (Doc. 34 at 11.) Garwood alleges that she obtained Hall's contact information and that Hall informed her of the note left by K.B., neither of which appear in the recording. Terrell stated that a verbal tirade uttered by Hall is also absent.

Plaintiffs' efforts to create an inference of discrimination by unsupported allegations of evidence-tampering are wholly insufficient for several reasons. First, there are evidentiary shortcomings fatal to plaintiffs' assertion that defendants altered the recording. Plaintiffs' argument is premised solely upon Garwood's statement that she believed the recording to be altered. (Doc. 27, Ex. B at 131.) However, she testified that she lacked any specialized knowledge from which to form such a conclusion, rendering her statements to that effect inadmissible. See FED. R. EVID. 701 (stating that lay witnesses may not offer testimony "based on scientific, technical or other specialized knowledge"); (Doc. 27, Ex. B at 131-132.) Plaintiffs have proffered no additional expert testimony explaining how the recording was altered or why they believe defendants have tampered with it. Without such evidence, the mere quality of the recordings, standing alone, is insufficient to raise an inference that defendants discharged plaintiffs on a discriminatory basis.

Second, defendants avowedly discharged plaintiffs for a variety of reasons, including inflammatory comments made to Hall, Garwood's failure to enter Hall's information into the CAD system, and Terrell's inappropriate handling of the emergency request. Accepting plaintiffs' versions of the 911 calls *in toto*, the

resulting conversations would still violate established police department protocol.

Garwood's telephone etiquette, including her inquiry into whether Hall was "going

to file charges against the sitter," failed to comply with department policies, as did

her failure to enter the call into the CAD system.  Terrell's handling of the second

call, during which she told Hall that "[y]ou made the choice to leave your child

there—I don't understand what you want the police to do at this point" is similarly

noncompliant.  Plaintiff's assertion that the missing segments of conversation alone

raise an inference of invidious discrimination evaporates when compared with the

weighty nature of these infractions.  It is highly improbably that defendants, when

presented with plaintiffs' egregious misconduct, excised *sub rosa* alleged

conversations about Hall's contact information, K.B.'s note, and Hall's expletive-

laden tirade from the recording out of a discriminatory motive.

Moreover, the evidence of record reveals that defendants also terminated

employees outside of Garwood and Terrell's protected class who committed

infractions similar to those of plaintiffs.  Theresa Williams ("Williams"), a Caucasian

supervisor in the communications center, was terminated in July of 2005 for her

handling of an emergency call that she received during the predawn hours of June

28.  (Doc. 27, Ex. D-18.)  The caller was the apparent victim of an armed robbery.

(Id.)  Williams informed him that no police officers were available to assist him and

recommended that he file a report in person at the communications center,

approximately one block from his place of employment.  (Id.)  Williams never

entered the call in the CAD system, and officers did not respond to the crime scene

22

at the time of the incident.  (Id.)  Records of police activity indicated that at least

three police vehicles were available to respond when Williams spoke with the caller.

(Id.)

When Gilcrist approached Williams to discuss her handling of the call, she

behaved as if she were unaware of the situation.  (Id.)  She admitted during later

discussions that she neglected to enter the call into the CAD system and that she

minimized the significance of the robbery during her conversation with the victim.

(Id.)  She was terminated for the manner in which she responded to the caller's

emergency request.  (Id.; Doc. 27, Ex. H ¶ 46.)  The city also terminated her for

failing to enter the call into the CAD system and for failing to acknowledge the

mistake.  (Doc. 27, Ex. D-18.)

Like Garwood, Williams failed to input emergency data into the CAD system,

and, like Terrell, she exhibited unprofessional telephone etiquette when confronted

with an emergency scenario.  All three employees failed to obtain required

information from callers, and all three were terminated for their inappropriate

responses to callers' requests for police assistance.  The similar discipline meted out

upon Garwood, Terrell, and Williams strongly indicates that plaintiffs were not

discriminatorily discharged on the basis of their race but rather as a result of their

failure to adhere to established department protocols.

For all of these reasons, Garwood and Terrell have failed to raise an inference of discrimination, and their prima facie case of disparate treatment fails as a result.[12]  Summary judgment on plaintiffs' Title VII claims will be granted.[13]

---

[12]Assuming, *arguendo*, that Garwood and Terrell had established a prima facie case of discrimination, their claims would nevertheless fail for lack of evidence of pretext.  Defendants have produced sufficient evidence that Garwood and Terrell were terminated for the legitimate non-discriminatory reasons that they did not follow established police procedure, exhibited callous telephone etiquette toward a distressed caller, failed to input call information into the CAD system, and refused to accept responsibility for their mistakes.  (See Doc. 27, Ex. H ¶¶ 47-48; Doc. 27, Ex. J at ¶¶ 17, 20.)  Garwood and Terrell argue that these proffered reasons are pretextual because the incomplete recording of the emergency calls creates a genuine issue of fact from which a jury could find that defendants acted with racial animus when terminating plaintiffs.  (Doc. 34 at 12-16.)  Proving pretext places a "difficult burden" on the plaintiff.  Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 386 (3d Cir. 1999).  The plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."  Keller, 130 F.3d at 1009.  As discussed above, the allegedly incomplete recordings fail to demonstrate that defendants acted with discriminatory intent when they discharged plaintiffs.  Defendants have stated that Garwood and Terrell were discharged for their inept handling of an emergency situation that could have further endangered the welfare of G.H. and K.B. by delaying police assistance.  After evaluating plaintiffs' proffered evidence of discrimination, no reasonable jury could conclude that defendants' asserted reasons for discharging plaintiffs were pretextual.  Plaintiffs' failure to establish pretext provides an appropriate alternative ground for disposition of the motion for summary judgment.

[13]Disparate treatment claims under the PHRA are analyzed under a framework equivalent to that of Title VII.  See Parks v. Lifepath, Inc., No. 2007 WL 2323131, at *3 (E.D. Pa. Aug. 9, 2007).  The court will grant defendants' motion with respect to plaintiffs' PHRA claims for reasons identical to those discussed above.

### B.     The § 1983 Claims

Section 1983 offers private citizens a means to redress violations of federal

law committed by state officials.  See 42 U.S.C. § 1983.  The statute provides, in

pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

Id.  Section 1983 is not a source of substantive rights and instead provides a method

for vindicating rights secured elsewhere in federal law.  Gonzaga Univ. v. Doe, 536

U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  A § 1983

plaintiff must demonstrate that the defendant, while acting under the color of state

law, deprived the plaintiff of a federal constitutional or statutory right.  Kaucher v.

County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  Plaintiffs advance claims under

§ 1983 for violation of their equal protection right to be free of race discrimination.

(See Doc. 1 ¶¶ 54, 59.)

### 1.     Equal Protection Claims against the Harrisburg Police Department

It is well-settled that police departments operated by municipalities are not

"persons" amenable to suit under § 1983.  See Martin v. Red Lion Police Dep't, 146

F. App'x 558, 562 n.3 (3d Cir. Aug. 16, 2005); James v. Lumberton Police Dep't, No.

Civ. A. 06-2188, 2006 WL 3733024, at *3 n.2 (D.N.J. Dec. 12, 2006); Texter v. Merlina,

No. 1:04-CV-0173, 2005 WL 1513117, at *1 (M.D. Pa. June 27, 2005); Benckini v. Upper Saucon Twp., No. Civ. A. 04-4304, 2005 WL 670688, at *2 (E.D. Pa. Mar. 23, 2005). An attorney's failure to name a department's municipality in a complaint has no effect on the department's status as a non-person for purposes of a civil rights action. To the contrary, governmental subunits lack the capacity to be sued regardless of whether their accompanying municipalities participate in the lawsuit. See James, 2006 WL 3733024, at *3 n.2 (advising *pro se* plaintiff who sued police department without naming municipality as a defendant that "[p]laintiff should be aware that a police department is not a 'person' subject to suit under § 1983"); see also Richardson v. U.S. Marshals Serv., No. Civ. A. 3:07-0304, 2007 WL 1464582, at *2 (M.D. Tenn. May 15, 2007) (observing that a county sheriff's department could not be sued under § 1983 notwithstanding the county's non-participation in the lawsuit); Shimer v. Shingobee Island Water & Sewer Comm'n, No. Civ. A. 02-953, 2003 WL 1610788, at *4 (D. Minn. Mar. 18, 2003) ("[A]bsent specific statutory authority, . . . subordinate [governmental] entities do not have the capacity to sue or be sued.").

In the present case, plaintiffs advance § 1983 claims against the Harrisburg Police Department but have not appended the City of Harrisburg as a defendant. The police department lacks existence independent of the City of Harrisburg and is

not a "person" amenable to suit under § 1983.  Summary judgment will be entered in favor of the police department on plaintiffs' § 1983 claims.[14]

### 2.   Equal Protection Claims against Kellar, Pickles, and Gilcrist

To assert an equal protection claim based upon membership in a protected class, the plaintiff must demonstrate (1) that he or she is a member of a protected class and (2) that the government treated similarly situated individuals outside of the protected class differently.  See Oliveira v. Twp. of Irvington, 41 F. App'x 555, 559 (3d Cir. 2005); Keenan v. City of Phila., 983 F.2d 459, 465 (3d Cir. 1992) (requiring plaintiffs to demonstrate differential treatment on the basis of membership in a protected class).  When alleging the existence of individuals outside the protected class, a plaintiff "cannot use allegations . . . that amount to nothing more than 'conclusory, boilerplate language' to show that he may be entitled to relief."  Young v. New Sewickley Twp., 160 F. App'x 236, 266 (3d Cir.

---

[14]Were plaintiffs able to advance their § 1983 claims against the police department or the City of Harrisburg, granting summary judgment in favor of defendants would nevertheless remain an appropriate disposition of their claims.  A municipality acting through its constituent agencies may be held liable only if the plaintiff can "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).  Liability may not be founded exclusively on the actions of the municipalities' employees via respondeat superior. Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991). Municipal liability also requires the plaintiff to demonstrate that "'there is a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation.'" Brown v. Muhlenberg Twp., 269 F.3d 205, 214 (3d Cir. 2001) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).  In the present matter, plaintiffs have failed to adduce any evidence that any defendant violated their equal protection rights.  See infra Part III.B.2.  Moreover, they have not identified any policy or custom of the police department that operated to produce the purported constitutional violations.

2006) (citing <u>Evancho v. Fisher</u>, 423 F.3d 347, 354-55 (3d Cir. 2005)).  The plaintiff

must instead identify individuals outside of the plaintiff's protected class who

received differential treatment.  <u>See</u> <u>Harris v. New Jersey</u>, No. Civ. A. 02-2002, 2008

WL 141503, at *10 (D.N.J. Jan. 14, 2008); <u>Lane v. Culp</u>, No. Civ. A. 05-576, 2007 WL

954101, at *1 (W.D. Pa. Mar. 28, 2007).  In this respect, the evidence required to

prove a protected-class equal protection claim is equivalent to that required for a

Title VII disparate treatment case.  <u>See</u> <u>Black v. Columbus Pub. Sch.</u>, 79 F. App'x

735, 738 (6th Cir. 2003); <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1483 n.4 (3d Cir.

1990) (observing that both Title VII and equal protection claims require proof of

discrimination based upon membership in a protected class).

As discussed in Part III.A, <u>supra</u>, plaintiffs have failed to identify any

individual outside of their protected class whom defendants disciplined differently

than plaintiffs.  The discipline imposed on Williams, the only employee to commit

similar infractions, was identical to that which Garwood and Terrell received.

Absent any evidence of differential treatment of individuals outside plaintiffs'

protected class, their equal protection claims must fail for substantially the same

reasons that their Title VII claims prove ineffective.  Accordingly, the court will

grant the defendants' motion for summary judgment with respect to plaintiffs'

equal protection claims under § 1983.[15]

## IV.   <u>Conclusion</u>

Plaintiffs have failed to produce evidence that defendants conferred different

treatment on any similarly situated employee outside their protected class.  Failure

to establish any disparate treatment renders plaintiffs' Title VII and equal

protection claims otiose.  Summary judgment will be entered in favor of defendants

and against plaintiffs on all claims.

An appropriate order follows.


 S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Date:        April 30, 2008

---

[15]Plaintiffs' complaint does not specify whether they pursue their equal
protection claims under the protected-class theory or the class-of-one theory.  The
court has addressed these claims under the protected-class theory because
plaintiffs predicate them upon the "right[] to be free from race discrimination."
(Doc. 1 ¶¶ 54, 59.)  Membership in a protected class is not required for a class-of-one
claim.  <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (explaining that
equal protection prevents intentional, arbitrary discrimination against individuals)
Nevertheless, were plaintiffs to rely on the class-of-one theory, they would remain
obligated to produce evidence of similarly situated individuals whom defendants
treated differently.  <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 239 (3d Cir. 2006).  In
light of their failure to do so, <u>see</u> <u>supra</u> Parts III.A.1 & III.B.2, granting summary
judgment would constitute the appropriate disposition of such claims.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LISA TERRELL and**<br>**NAIDEA GARWOOD,** | : | **CIVIL ACTION NO. 1:06-CV-1004** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF HARRISBURG POLICE** | : | |
| **DEPARTMENT, CHARLES KELLAR,** | : | |
| **RICHARD PICKLES**, and **TODD** | : | |
| **GILCHRIST,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 30th day of April, 2008, upon consideration of defendants'

motion for summary judgment (Doc. 24), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1.  The defendants' motion for summary judgment (Doc. 24) is
    GRANTED.

2.  The Clerk of Court is directed to enter JUDGMENT against plaintiffs
    and in favor of defendants on all claims.

3.  The Clerk of Court is directed to CLOSE this case.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge